UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KRISTIN BENZINGER *on behalf of herself, individually, and on behalf of all other similarly-situated*,

Plaintiff,

-v-

LUKOIL PAN AMERICAS, LLC, and
LITASCO S.A.,

Defendants.

16 Civ. 8533 (PAE)

<u>OPINION & ORDER</u>

---

PAUL A. ENGELMAYER, District Judge:

Plaintiff Kristin Benzinger, who identifies as an American of German descent, was

employed by defendant Lukoil Pan Americas, LLC ("Lukoil"), as an executive assistant between

April 2013 and February 2015. Benzinger brings claims against Lukoil and its parent company,

defendant Litasco S.A., for employment discrimination—on the grounds that she was allegedly

treated less well than her Russian colleagues—and retaliation, in violation of the New York State

Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"), and the New York City Human

Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.* ("NYCHRL"). Benzinger also brings claims

for retaliation under the Fair Labor Standards Act, 29 U.S.C. § 215 ("FLSA"), and the New York

Labor Law, N.Y. Lab. Law § 215 ("NYLL").[1]

Pending now is defendants' motion for partial summary judgment as to Benzinger's

discrimination and retaliation claims. For the reasons that follow, the Court grants defendants'

---

[1] Benzinger also brings claims for failure to pay overtime and failure to furnish proper wage statements as required under the FLSA and NYLL. Defendants do not seek summary judgment as to these claims.

motion as to all claims under the NYSHRL and the NYCHRL, but denies the motion as to Benzinger's FLSA and NYLL retaliation claims.

## I.    Background

### A.    Factual Background[2]

#### 1.    The Parties

Lukoil is a Delaware limited liability company engaged in the trading of petroleum products and crude oil.  Def. 56.1 ¶ 2.  Lukoil has its executive office in New York, New York. *Id.*  Litasco is the parent company for Lukoil and other subsidiaries around the world.  *Id.* ¶ 65. Litasco is located in Geneva, Switzerland.  *Id.* ¶ 69.

Benzinger, who identifies as an American of German descent, worked at Lukoil's New York City office beginning in April 2013.  *Id.* ¶ 14.  She worked there until February 2015, when she left for a higher-paying job as Director of the President's House in the Office of the President of Columbia University.  *Id.* ¶¶ 54–58.

---

[2] The Court draws its account of the underlying facts from the parties' respective submissions on the motion for summary judgment, including: the parties' joint statement of undisputed facts, Dkt. 66 ("JSF"); defendants' Local Rule 56.1 statement, Dkt. 72 ("Def. 56.1"); plaintiff's Rule 56.1 counter-statement, Dkt. 84 ("Pl. 56.1"); the declaration of Adam E. Collyer in support of defendants' motion, Dkt. 69 ("Collyer Decl."), and attached exhibits; the declaration of Simon Fenner in support of defendants' motion, Dkt. 70 ("Fenner Decl."), and attached exhibits; the declaration of Gabrielle M. Vinci in opposition to the motion, Dkt. 82 ("Vinci Decl."), and attached exhibits; and the declaration of Glory Perazzo in support of defendants' motion, Dkt. 88 ("Perazzo Decl."), and attached exhibits.

Citations to a party's 56.1 statement incorporate the evidentiary materials cited therein.  When facts stated in a party's 56.1 statement are supported by testimonial, video, or documentary evidence and not denied by the other party, or denied by a party without citation to conflicting admissible evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in statement required to be served by the opposing party."); *id.* Rule 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

## 2.    March 2013: Lukoil Hires Benzinger

By letter dated March 22, 2013, Lukoil offered Benzinger the position of executive assistant, at the company's New York City headquarters, subject to a 90-day introductory period. *Id.* ¶ 1.  On March 23, 2013, Benzinger accepted Lukoil's offer by executing the offer letter.  She began working on April 29, 2013.  *Id.* ¶¶ 3, 14.

At the time of Benzinger's hiring, the base annual wage for the executive assistant position was $85,000, payable semi-monthly.  *Id.* ¶ 4.  As an executive assistant, Benzinger was eligible for a discretionary bonus that was not guaranteed and was contingent upon a variety of factors, including company and individual performance.  *Id.* ¶ 5.  Benzinger was also eligible for a variety of other benefits, including medical and dental insurance, flexible spending accounts, long- and short-term disability plans, Lukoil's Employee Assistance Program, company-paid and voluntary life insurance, and a 401(k) plan.  *Id.* ¶ 6.  When she started working for Lukoil, Benzinger was eligible for three work weeks of vacation time, which she was granted pursuant to Lukoil's time-off policies.  *Id.* ¶ 7.

Benzinger was also eligible to participate in Lukoil's Profit Sharing Plan.  The Profit Sharing Plan involves a discretionary distribution from Lukoil to its employees as a whole. Eligibility for the Profit Sharing Plan and individual employee distributions are guided by rules generated by Lukoil's Profit Sharing Plan Committee and approved by the Internal Revenue Service in accordance with Section 401 of the Internal Revenue Code.  Lukoil's managing director determines the total amount of funding for the Profit Sharing Plan on an annual basis, but does not determine which employees receive Profit Sharing Plan distributions and does not have discretion over the amounts of the distributions to individual employees.  Lukoil employees are eligible to receive Profit Sharing Plan distributions only after one year of service;

distributions in the first year of eligibility are pro-rated based on the date an employee becomes eligible. *Id.* ¶¶ 8–13.

### 3. Benzinger's Role and Responsibilities

On April 29, 2013, Benzinger began working in Lukoil's New York City office. *Id.* ¶ 14. Between April 29, 2013 and July 2014, Benzinger reported directly to Lukoil's two managing directors, James Reynolds and Thomas Rodilosso. Managing director is the most senior executive position in Lukoil, managing all aspects of Lukoil's trading business in the United States and North America. Reynolds and Rodilosso are both American. *Id.* ¶¶ 15–17.

In July 2014, Simon Fenner became the new managing director of Lukoil. Between July 2014 and her departure from Lukoil in February 2015, Benzinger reported directly to Fenner, who is British. *Id.* ¶¶ 18–19.

As executive assistant, Benzinger had various responsibilities, including performing a myriad of tasks for managing directors Rodilosso, Reynolds, and Fenner. *Id.* ¶ 20. Benzinger's duties and responsibilities in practice were more extensive than those listed in the job description in the offer letter she had executed. For example, Benzinger's duties also included assisting the managing director, assisting the chief legal director, and overseeing procurement, information technology, travel, and expenses. *Id.* ¶¶ 21–22. Benzinger also performed certain *ad hoc* work, including dealing with office remodeling, and she was involved in developing presentation strategy. *Id.* ¶¶ 23–24. In the "professional summary" she provided to Columbia University when seeking employment there in 2015, Benzinger described herself as Lukoil's "'go-to' person for office[-]related knowledge, IT and phone trouble[-]shooting" and noted that she had "identified inefficiencies and created and implemented solutions that saved money and time" at the company. *Id.* ¶¶ 25–26. Benzinger also renegotiated all office supplier contracts, upgraded

Lukoil's lunch ordering program, created a new electronic filing system, and assisted in obtaining visas for foreign workers. *Id.* ¶ 27.

### 4. Benzinger's Relationship with Inga Bogutska

Benzinger identifies Inga Bogutska as a key comparator. Bogutska, who began working for Lukoil in 2009, was the executive assistant before Benzinger's hiring. *Id.* ¶ 30; Fenner Decl. ¶ 22. Bogutska was effectively demoted when Benzinger was hired. Fenner Decl. ¶ 22.

The parties dispute whether and to what extent Benzinger served as Bogutska's supervisor or manager. Benzinger concedes that she supervised Bogutska on certain projects, but disputes defendants' characterization that she was Bogutska's *de facto* supervisor. Def. 56.1 ¶ 28; Pl. 56.1 ¶ 28.[3] When asked which of her job responsibilities she found "annoying," Benzinger replied, "[i]t was a challenge to manage and supervise [Bogutska]." Def. 56.1 ¶ 29; Benzinger Tr. at 160.

Although Bogutska had worked for Lukoil since 2009, her base salary in 2014 was $73,129.92, Def. 56.1 ¶ 30, whereas Benzinger earned $85,000.08 in base salary, *id.* ¶ 31. Both Bogutska and Benzinger also earned discretionary bonuses for performance. In 2014, Lukoil paid Bogutska a $10,000 discretionary bonus and paid Benzinger a $12,500 discretionary bonus. *Id.* ¶¶ 32–34. Benzinger's total compensation in 2014—paid by Lukoil—was $14,370 greater than Bogutska's. *Id.* ¶ 35.

---

[3] At her deposition, Benzinger testified that "[the managing directors] wanted me to help [Bogutska] manage and supervise her work." Vinci Decl., Ex. 4 ("Benzinger Tr.") at 68. When asked whether she considered herself Bogutska's supervisor, Benzinger replied, "[o]n projects or helping her, *de facto* yes." Benzinger Tr. at 69. Drawing all inferences in Benzinger's favor, the Court discerns a technical dispute as to Benzinger's status as a manager or supervisor, but the record is unambiguous that Benzinger played at least some supervisory role with respect to Bogutska, at the request of the managing directors.

In 2014, Benzinger and Bogutska also both received Profit Sharing Plan distributions. Bogutska received a distribution of $15,265.16 based on her total annual compensation, which included her base salary and discretionary bonus. *Id.* ¶ 36. Benzinger received a distribution of $10,405.68, which was prorated for two-thirds of one year of her compensation because she did not become eligible according to the Profit Sharing Plan rules until April 29, 2014.[4] *Id.* ¶ 37.[5]

**5. Benzinger's Requests for Increased Compensation and Role**

In March 2014, having worked at Lukoil for less than a year, Benzinger requested a $5,000 raise in her base salary, but did not receive that increase at that time. *Id.* ¶¶ 38–39. In July 2014, Fenner became Lukoil's new managing director, to whom Benzinger directly reported. *Id.* ¶ 18. Soon after Fenner's hiring, Benzinger sought and obtained a meeting with Fenner and Jennifer Diehl, Lukoil's human resources consultant, to discuss several requests related to her salary and role with the company. *Id.* ¶ 40; JSF ¶ 23. At the meeting, Benzinger again requested a $5,000 increase in her base salary and an expanded role in the office, stated

---

[4] Although Benzinger's start date of April 29, 2013, and the Profit Sharing Plan's eligibility and proration rules are undisputed, Benzinger quibbles that the exhibit defendants cite in support of this proposition demonstrates only the amount of Benzinger's distribution, not any explanation of that amount. However, each individual fact is supported by the record and is undisputed. *See* Def. 56.1 ¶¶ 13 (Profit Sharing Plan rules); 14 (start date); 37 (amount of Benzinger's 2014 distribution). Accordingly, this fact is undisputed.

[5] Benzinger notes that the document defendants cite to demonstrate Benzinger and Bogutska's distributions under the Profit Sharing Plan also contains a column with the header "Annual Additions." Pl. 56.1 ¶ 37.1–2 (citing Vinci Decl., Ex. 6). This column shows that Benzinger received $11,326.47 in "Annual Additions," while Bogutska received $21,115.64. *Id.* As Lukoil's manager of human resources explained, however, "annual additions" are not a separate category of compensation, but rather are the sum of Lukoil's Profit Sharing Plan distribution to an employee plus that employee's elective deferrals to his or her 401K retirement plan for that year. *See* Perazzo Decl. ¶¶ 8–16. In other words, in 2014, Bogutska received a distribution of $15,265.16, based on a full year of profit-sharing eligibility, and deferred $5,850.48 of her compensation to her 401K, for a total of $21,115.64 in "Annual Additions." *Id.* ¶¶ 12–14. Benzinger, in turn, received a distribution of $10,405.68, based on eight months of profit-sharing eligibility, and deferred $929.79 of her compensation to her 401K, for a total of $11,326.47 in "Annual Additions." *Id.* ¶¶ 9–11.

that her total compensation expectation in the role of Executive Assistant was in the range of

$135,000 and $140,000, and sought a fourth week of vacation time.  Def. 56.1 ¶¶ 42–44.  After

the meeting, on September 30, 2014, Benzinger wrote to Fenner and Diehl:

> Hi Jenn and Simon,
>
> In summation of our recent meeting:
>
> - I am above or within the benchmark for my current role of Executive Assistant[;]
> - Performance reviews only determine bonus size, they will be completed in March 2015[;]
> - I am to continue to respond to afterhours request[s] only if they are urgent
> - We will explore role expanding and upgrade opportunities in the mid and long term[;]
> - I requested a $5,000 increase in base salary first in March of 2014 and again today[;]
> - I will remain an exempt employee[;]
> - [My] [t]otal comp expectation is 135k – 140k in the E[xecutive] A[ssistant] Role
>
> The one thing I forgot:  Can we make my 4th week of vacation official and in writing now?
>
> All best,
>
> Kristin Benzinger
> Office Ninja and Coor[din]ator of Special Projects

Collyer Decl., Ex. H; *see* Def. 56.1 ¶¶ 41–44.[6]

Responding in the same email thread, on October 29, 2014, Fenner wrote to Benzinger

that she would not receive a $5,000 raise because she was above the Lukoil salary benchmark for

---

[6] Benzinger disputes the extent to which this email was "a total and all-encompassing summary of the sum and substance of the referenced meeting."  Pl. 56.1 ¶ 41.  In particular, and drawing all inferences in Benzinger's favor, Benzinger also complained that she had been misclassified as an exempt employee, that she was entitled to earn overtime compensation, and that she believed she was being compensated less than Bogutska, which Benzinger viewed as unfair treatment.  *Id.* ¶¶ 41, 42.1, 42.4.  Benzinger also testified that she continued to pursue these issues thereafter, and later requested to be paid overtime.  *Id.* ¶ 42.6–7.

her current role, Def. 56.1 ¶ 45, based on benchmarking data provided by a third-party staffing and executive search firm, Fenner Decl. ¶ 12. However, in the same email, Fenner also advised Benzinger that her base salary would be reviewed at indeterminate point, and that he and Diehl would explore expanding Benzinger's role and upgrading her mid- and long-term opportunities at the company. Def. 56.1 ¶ 46. Fenner also informed Benzinger that she would not receive a permanent fourth week of vacation, explaining that he had spoken with his predecessor, Rodilosso, who had confirmed that Benzinger's four-week vacation allowance had been a special dispensation for the year she was married and had other family commitments. *Id.* ¶ 47. Fenner also committed to "work[ing] with [Diehl] to determine if [Benzinger] should be a non-exempt employee." Collyer Decl., Ex. I at 2.

In response to Fenner's email, on November 1, 2014, Benzinger wrote Fenner, thanking him for his detailed response and acknowledged that, while she was disappointed with his initial conclusions, she was excited to work with Fenner on future solutions and evolving her role. Def. 56.1 ¶ 48.[7] Benzinger further wrote that "[t]he exempt vs. non[-exempt] concept is not an angle I wish to pursue due to the nature of the business and your concept of flexibility and quality of life work balance. Calculating hours is a waste of time and I am happy [to] have the flexibility of working some extra hours one week and leaving early the next with your approval." Collyer Decl., Ex. I at 1.

### 6. Benzinger's Job Search and Resignation from Lukoil

Shortly thereafter, Benzinger began searching elsewhere for employment, interviewing with Columbia University ("Columbia") and one other company. Def 56.1 ¶ 50. On January 5, 2015, Columbia offered Benzinger the position of Director of the President's House in the Office

---

[7] In that regard, Benzinger developed an aspirational job description that she forwarded to both Fenner and Diehl, in which she referred to herself as the "office ninja." Def. 56.1 ¶ 49.

of the President. *Id.* ¶ 51. On January 22, 2015, after delaying acceptance so that she could interview with another potential employer, Benzinger accepted Columbia's offer. Columbia confirmed Benzinger's verbal acceptance by letter the same day. *Id.* ¶¶ 52–53. As Director of the President's House, Benzinger earned a starting salary of $115,000 annually and, as of July 2018, an annual salary of $130,000 in that position—in line with the salary she had sought during her September 2014 meeting with Fenner and Diehl. *Id.* ¶¶ 54–55, 58. On January 20, 2015, after accepting her new position with Columbia, Benzinger resigned from Lukoil. *Id.* ¶ 56. February 3, 2015 was Benzinger's last day of employment with Lukoil. *Id.* ¶ 57.

### 7. Composition of Lukoil's Staff and Alleged Favoring of Russians

In December 2014, during Benzinger's employment, just two of Lukoil's 48 total employees—Ruzanna Zaziyants and Anastasia Bagin-Borzilov—held Russian passports. *Id.* ¶ 59. Lukoil does not maintain national origin data on its employees. *Id.* None of Fenner's direct reports in legal, human resources, IT, treasury, trading, or risk were of Russian descent. *Id.* ¶ 60.[8] None of the three managing directors to whom Benzinger reported during her tenure at Lukoil were of Russian descent: Fenner is British, while James Reynolds and Thomas Rodilosso are American. Tim Bullock, the sole member of the Lukoil Board of Directors during Benzinger's entire tenure at Lukoil, is British. After Benzinger resigned in January 2015, she

---

[8] Benzinger purports to dispute this fact, as well as the assertion that only two out of 48 Lukoil employees held Russian passports. As to both facts, Benzinger cites only her deposition testimony that she believed other employees—Bogutska, employees named Yuri and Anya who worked in operations, and a Litasco employee named Irina Akinshina—were "of Russian descent and/or ancestry." Pl. 56.1 ¶ 59. Assuming Benzinger's belief were admissible evidence of the employees' national origin—and correct—that would make only five out of 48 Lukoil employees, and not necessarily any of Fenner's direct reports, Russian. Accordingly, these facts are, at most, partially disputed.

was succeeded by Monique Charles, who is American. *Id.* ¶¶ 61–63. Inga Bogutska is Ukrainian. *Id.* ¶ 64.[9]

Benzinger testified that she decided to resign from Lukoil because the company—and Fenner and the human resources department, in particular—did not treat employees fairly, including by failing to pay overtime and by "treating Russian employees better." Pl. 56.1 ¶ 57.1. Before Benzinger's departure from Lukoil, she told Fenner that she felt she had been left out, that she believed she was compensated less than Bogutska, and that she was owed wages as a result of having been misclassified as an exempt employee. Collyer Decl., Ex. B ("Fenner Tr.") at 74–75; *see* Pl. 56.1 ¶ 57.3. Fenner was also aware that Benzinger had discussed her status as an exempt employee with Diehl. Fenner Tr. at 70–71; *see* Pl. 56.1 ¶ 57.6.

Citing Fenner's deposition testimony, Benzinger also states that Fenner was aware that Benzinger had complained about discrimination while employed with Lukoil. Pl. 56.1 ¶ 57.2. This assertion mischaracterizes Fenner's testimony. In fact, Fenner testified, in the portion of the deposition cited by Benzinger, the opposite:

> **Q:** Have you ever heard Ms. Benzinger complain that she felt discriminated against at Lukoil?
> **A:** No.
> **Q:** Did anybody ever tell you that she had reported she felt discriminated against at Lukoil?
> . . .
> **A:** So the only time it came to my attention was right at the very end, just before she resigned.
> **Q:** Can you describe, specifically, what came to your attention with respect to Ms. Benzinger's complaints, that she had felt discriminated [against] at Lukoil?

---

[9] Benzinger believes that Bogutska is Russian or of Russian descent, Benzinger Tr. at 76, 78, although she concedes that Bogutska "could be" Ukrainian, *id.* at 87. In addition to the evidence cited in defendants' 56.1 statement, Bogutska's Ukrainian background is confirmed by her resume, which states that Bogutska attended the Ukraine Polytechnical Institute in Kiev and the Ukraine School of Art in Kiev. Collyer Decl., Ex. P. Drawing all inferences in Benzinger's favor, it is possible that Bogutska is of Russian descent.

**A:** She told me, just before she resigned, that she felt like she wasn't part of a team, words to that effect.

**Q:** Did she specifically say she felt discriminated against?

**A:** No.

**Q:** Did she say why she did not feel she was part of the team?

**A:** No.

Fenner Tr. at 35–37.[10]

Benzinger also testified that she thought Russian employees were promoted more quickly and provided more opportunities for professional development, training, and travel. Pl. 56.1 ¶ 57.5 (citing Benzinger Tr. at 76, 78, 80–81, 83–84). In particular, Benzinger believed that Bogutska, Irina Akinshina, a "manager named Yuri" in the operations department, and another member of the operations department named Anya, were all Russian and all had more opportunities for development, training, and travel. Benzinger Tr. at 76, 78, 80–81, 83–84. Benzinger's basis for believing that Bogutska, Yuri, and Anya are Russian is that she thought she heard them speaking Russian—Bogutska and Yuri to each other, and Anya on the phone. *Id.* at 79, 86. Benzinger does not speak Russian. *Id.* at 79. Yuri has a Ukrainian passport, Fenner Decl. ¶ 15, and, as reviewed above, Bogutska is Ukrainian.

Yuri and Anya worked in the operations department—a separate section of Lukoil. Benzinger Tr. at 78–83. Benzinger testified that she did not have similar job duties to Yuri, did not "know the circumstances around" his promotion in the operations department, and did not know how long he had been employed before he was promoted. *Id.* Likewise, Benzinger conceded that she did not know what Anya's job duties were or how long she had been employed by Lukoil, that she had never seen Anya's resume, and that she was not involved in

---

[10] Benzinger further testified that she "might have made a comment regarding the subject [of discrimination]" to Fenner "[c]asually in the summer of 2014," and that she raised the issue of Bogutska's compensation at her 2014 meeting with Fenner and Diehl. Benzinger Tr. at 105–08. Her email summary of that meeting, however, does not mention discrimination, favoritism, or Russians. Collyer Decl., Ex. H.

evaluating Anya. *Id.* at 82–86. Akinshina, who works in Geneva, Switzerland, was the head of Litasco's human resources department. *Id.* at 82; Fenner Decl. ¶ 8. Benzinger did not know how long Akinshina had been employed with Litasco before being promoted, whether anyone else applied or was considered for the same position, or who made the decision to promote Akinshina. Benzinger Tr. at 94, 96.

### 8. Lukoil's Relationship with Litasco

As reviewed above, Litasco, which is located in Geneva, Switzerland, is the parent company for Lukoil and other subsidiaries around the world. Def. 56.1 ¶¶ 65, 69. Lukoil and Litasco are separate corporate entities, *id.* ¶ 66, although Benzinger contends that they operate as a single entity with respect to the daily operations, oversight, and maintenance of Lukoil's New York office, Pl. 56.1 ¶ 66.

Fenner, as Lukoil's managing director, reports to the sole member of the Lukoil Board of Directors, who is Litasco's CEO. Def. 56.1 ¶ 70. When Lukoil hired Fenner as managing director, Litasco's CEO was Tim Bullock. *Id.* ¶ 71. At all relevant times, Lukoil paid its employees' wages, including Benzinger's; Litasco did not pay Lukoil employees' wages. *Id.* ¶ 79.

Fenner attested that "[w]hile Lukoil is a wholly-owned subsidiary of Litasco, [t]he companies are operated in separate countries, out of separate offices, with separate accounts, with separate staff performing company-specific roles[,] and . . . corporate formalities between the two companies . . . observed." Fenner Decl. ¶ 6. Fenner further noted that "Lukoil and Litasco each maintain separate human resources departments to handle employee issues that arise in each respective company." *Id.* ¶ 8. Specifically, Lukoil's human resources department is run by Glory Perazzo, who reports to Fenner. Before Perazzo's employment, Lukoil used the services of an outside human resources coordinator, Jennifer Diehl, who did not provide those

services to Litasco. *Id.* In contrast, Litasco's human resources department is run by Akinshina, who is in Geneva. *Id.* However, Benzinger testified that Diehl handled human resources issues "in partnership with HR Litasco." Benzinger Tr. at 104–105; *see* Def. 56.1 ¶ 68.

At his deposition, Fenner testified that he is employed by Lukoil, not Litasco. Fenner Tr. at 17; that Litasco is not directly involved in the day-to-day operations of Lukoil, *id.*; that Litasco does not have any oversight into personnel decisions at Lukoil, such as the hiring and firing of employees, *id.*; that Litasco does not have any oversight over employee compensation at Lukoil, *id.*; that Litasco does not have any direct oversight function over human resources at Lukoil, *id.*; and that Lukoil has had its own human resources department for at least five years, *id.* at 18. *See* Def. 56.1 ¶¶ 67, 72–78.

Benzinger recites several additional facts, which she claims create a dispute of fact as to the subjects of Fenner's declaration and testimony. The Court reviews these in turn.

First, citing Fenner's deposition testimony, Benzinger states that "Fenner has been asked to, and has in fact, interviewed individuals for employment at Litasco." Pl. 56.1 ¶ 72 (citing Fenner Tr. at 23). However, the cited testimony unambiguously relates to Fenner's experience interviewing for the managing director job at Lukoil, not his interviewing of individuals for employment at Litasco.[11] The Court thus disregards this purported fact.

Second, Benzinger states that she was "at times supervised by, and reported to, employees of Litasco including . . . Akinshina." *Id.* (citing Benzinger Tr. at 14, 19–21, 132–33). Benzinger testified that her contact with Akinshina "varied based on what was going on," and that she considered Akinshina to be her supervisor as to certain projects—specifically:

---

[11] It is unsurprising that Fenner, while interviewing for the top executive position at a subsidiary company, had interviews with representatives of that subsidiary's parent.

"performance management training," which entailed "organizing the paperwork of the performance reviews" for which the managing directors were responsible; "[g]oal settings," which "was about how to set goals for your role according to the Litasco model"; and "[o]rganizing visas." Benzinger Tr. at 14, 19–21. Benzinger also testified that, for proposed expenditures of greater than a certain threshold (either $5,000 or $20,000), Litasco required the use of a "[t]ender [p]rocess," in which documents were submitted for approval, under the supervision of Fenner. *Id.* at 132–134. This testimony does not contradict any of Fenner's statements, although it does contain relevant additional facts.

Third, Benzinger states that Litasco has placed interns, whose expenses were paid by Litasco, at Lukoil's New York office. Pl. 56.1 ¶ 72 (citing Vinci Decl., Ex. 2 ("Benzinger Decl.") ¶ 13; Benzinger Tr. at 94–97). In particular, Benzinger testified that an intern named Julia or Yulia rotated through the New York office for a "few months." Benzinger Tr. at 94–97. This testimony does not conflict with any of Fenner's statements, although it does contain additional relevant facts.

Fourth, Benzinger notes that, in a letter dated January 1, 2014, the managing directors of Lukoil sent all Lukoil employees a Lukoil "Performance Management Policy" and a Litasco "Competency Model," both of which were effective immediately. *See* Pl. 56.1 ¶ 72 (citing Vinci Decl., Ex. 8). That letter stated that Litasco's human resources department was "at your disposal to assist you in the correct application of the present documents." Vinci Decl., Ex. 8. While relevant, this letter does not create a dispute of fact as to any fact supported by Fenner's testimony.

Fifth, Benzinger notes that Fenner testified that: he works closely with Bullock; the teams at Lukoil have "very tight relationships with all the other affiliates [of Litasco] . . . meaning, the

14

other subsidiaries of Litasco," as well as with teams at Litasco itself; he "frequently spend[s] time discussing strategy, business, and other matters with all the other affiliates; and that the human resources departments at Lukoil and Litasco "share policies, practices, general communications, [and] resources [*i.e.*, training materials] sometimes." Fenner Tr. at 15–16, 18; *see* Pl. 56.1 ¶ 72. This testimony, too, raises relevant additional facts, but it does not conflict with the facts recited by defendants.

## B. Procedural History

On November 2, 2016, Benzinger filed her complaint. Dkt. 1. On January 27, 2017, defendants filed a partial motion to dismiss. Dkts. 11–13. On March 6, 2017, Benzinger opposed the motion, Dkts. 18–20, and, on March 20, 2017, defendants replied, Dkt. 21. On July 12, 2017, the Court held argument on the motion, during which the Court authorized Benzinger to file an amended complaint by July 28, 2017. *See* Dkt. 26. On July 13, 2017, the Court denied as moot, without prejudice, defendants' partial motion to dismiss. *Id.*

On July 28, 2017, Benzinger filed her First Amended Complaint. Dkt. 27 ("FAC"). On August 10, 2017, the Court approved a case management plan. Dkt. 33. On September 8, 2017, defendants answered the FAC. Dkt. 37. On December 1, 2017, the Court referred the case to mediation, Dkt. 44, which lasted through April 2018 but was ultimately unsuccessful, *see* Dkt. 49. On May 3, 2018, the Court approved an amended case management plan, which allowed for an additional 90 days of fact discovery. Dkt. 52.

On February 8, 2019, after discovery, the parties filed a joint statement of undisputed facts. Dkt. 66. On March 8, 2019, defendants filed a motion for summary judgment and the Collyer Declaration, Dkt. 69, the Fenner Declaration, Dkt. 70, a brief in support of the motion, Dkt. 71 ("Def. Mem."), and a Rule 56.1 statement, Dkt. 72. On May 14, 2019, Benzinger submitted a brief in opposition, Dkt. 83 ("Pl. Mem."), her counterstatement to defendants' Rule

56.1 statement, Dkt. 84, and the Vinci Declaration, Dkt. 82. On June 11, 2019, defendants

submitted their reply brief, Dkt. 87 ("Def. Reply"), and the Perazzo Declaration, Dkt. 88.

## II.    Legal Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

The movant bears the burden of demonstrating the absence of a question of material fact. In

making this determination, the Court must view all facts "in the light most favorable" to the

non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the movant meets its burden, "the nonmoving party must come forward with

admissible evidence sufficient to raise a genuine issue of fact for trial in order to

avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

"[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to

overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010)

(citation omitted). Rather, to survive a summary judgment motion, the opposing party must

establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R.

Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing

law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986). In determining whether there are genuine issues of material fact, a court is "required

to resolve all ambiguities and draw all permissible factual inferences in favor of the party against

whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012)

(quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

In cases that involve claims of discrimination or retaliation, courts must use "an extra measure of caution" in determining whether to grant summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted). However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted). Thus, even in the context of a discrimination case, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *Holcomb*, 521 F.3d at 137; *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010), and courts may grant summary judgment against "discrimination claims in cases lacking genuine issues of material fact," *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (citation omitted).

## III. Discussion

Benzinger brings claims of discrimination and hostile work environment under the NYSHRL and the NYCHRL. Benzinger also brings claims of retaliation under the NYSHRL, the NYCHRL, the FLSA, and the NYLL. The Court addresses these claims in turn, and then addresses whether Litasco can be subject to liability in this case.

### A. Discrimination and Hostile Work Environment Claims

#### 1. NYSHRL Discrimination

Defendants move for summary judgment as to Benzinger's seventh cause of action, which alleges national origin discrimination in violation of the NYSHRL.

Under the NYSHRL, it is "an unlawful discriminatory practice" for an employer, based on an individual's race, color, or sex, "to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. State Exec. Law § 296(1)(a). NYSHRL

discrimination claims are governed by the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015); *see also Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 n.9 (2d Cir. 2008) (describing these claims as "analytically identical"). Under this framework, a plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *Holcomb*, 521 F.3d at 138. To do so, the plaintiff "must show: (1) [s]he belonged to a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (quoting *Holcomb*, 521 F.3d at 138). In employment discrimination cases, the burden of establishing a *prima facia* case is "minimal." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *see also Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019). However, a plaintiff cannot establish a *prima facie* case based on "purely conclusory allegations of discrimination, absent any concrete particulars." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985), *cert. denied*, 474 U.S. 829 (1985).

If the plaintiff can demonstrate a *prima facie* case, "a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–54 (1981)). At that point, the burden of production shifts to the employer to "'articulate some legitimate, nondiscriminatory reason' for the disparate treatment." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (employer's burden is "one of production, not persuasion").

If the employer satisfies that burden, the presumption of discriminatory intent drops away, and "the plaintiff must establish, by a preponderance of the evidence, that the employer's justification is a pretext for discrimination." *Lenzi*, 944 F.3d at 107 (citation omitted); *see also Holt v. KMI-Cont'l, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996). The plaintiff, however, is "not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that a prohibited factor was at least one of the 'motivating' factors" for the decision. *Holcomb*, 521 F.3d at 138 (citation omitted); *cf.* 42 U.S.C. § 2000e-2(m) (race, color, or sex must be "a motivating factor" for employment decision).

### a.    Prima Facie *Case*

For purposes of this motion, defendants do not dispute that Benzinger can establish the first two elements of a *prima facie* case: (1) that, as a self-identified American of German descent, Benzinger is a member of a protected class; and (2) that she was qualified for the position of Executive Assistant when she was hired in March 2013. Def. Mem. at 7. Defendants instead argue that Benzinger has not demonstrated the last two elements, because she has failed to show that (3) she suffered an adverse employment action, or (4) the circumstances gave rise to an inference of discrimination. *See id.* at 7–12. The Court agrees.

### i.    Lack of an Adverse Employment Action

An adverse employment action is a "'materially adverse change' in the terms and conditions of employment." *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (citation omitted). "To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (quoting *Sanders*, 361 F.3d at 755). "Examples of such a change include termination of employment, a demotion evidenced by a

decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id.* (quoting *Sanders*, 361 F.3d at 755).

"Subjecting an employee to unequal pay can, of course, constitute a materially adverse employment action." *Humphries v. City Univ. of N.Y.*, No. 13 Civ. 2641 (PAE), 2013 WL 6196561, at *6 (S.D.N.Y. Nov. 26, 2013) (internal quotation marks omitted). Because unequal pay is a relative concept, the key inquiry is whether the plaintiff has provided adequate comparators who are "similarly situated in all material respects." *Id.* (quoting *Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir. 2000)). What constitutes "all material respects" varies from case to case, but in the disparate pay context, a plaintiff typically must plead comparators' relevant experience and length of employment in order to raise an inference of discrimination. *See id.* at *7 (citing *Gupta v. N.Y.C. Sch. Constr. Auth.*, 305 F. App'x 687, 689 (2d Cir. 2008); *Sharpe v. MCI Commc'ns Servs., Inc.*, 684 F. Supp. 2d 394, 405 (S.D.N.Y. 2010)).

Here, Benzinger appears to raise four theories of adverse action, all of which rely on a comparison to purportedly Russian employees. Specifically, she argues that:

> [T]he record belies (sic) that [Benzinger]: (i) was afforded a significantly less allocation in her profit sharing distribution and annual additional allocations for the year ending 2014 than her comparator Inga Bogutska; (ii) observed Russian employees being promoted at a higher rate than non-Russian employees; (iii) was denied professional development opportunities while Russian employees were afforded more professional opportunities; and (iv) afforded additional perks not similarly extended to Plaintiff or other non-Russian employees.

Pl. Mem. at 8.

Benzinger's first theory is, in fact, belied by the record. Bogutska—who was essentially demoted when Benzinger was hired as executive assistant and who Benzinger sometimes managed and supervised—simply was not better compensated more than Benzinger. Even

assuming, *arguendo*, that Bogutska is Russian—an assumption for which the record provides virtually no support—Benzinger earned almost $12,000 more annually in base salary and received $2,500 more in discretionary bonus in 2014 than Bogutska. Def. 56.1 ¶¶ 30–34. It is undisputed that Benzinger's total earned compensation in 2014, which the parties treat as the key year for comparison, was $14,370 greater than Bogutska's. *Id.* ¶ 35.

Benzinger suggests that Bogustka received significantly greater profit-sharing allocations and "annual additions." But the record is clear that profit sharing allocations are distributed rigidly and non-discretionarily, varying as a function of base salary and months of eligibility. *See id.* ¶¶ 13, 37. Benzinger received a slightly smaller profit distribution in 2014 than Bogutska solely because Benzinger only became eligible for a pro-rated distribution on April 29, 2014, after one year of service, whereas the longer-tenured-but-lower-paid Bogutska was eligible for the full year. *Id.* ¶¶ 13–14, 36–37. Moreover, as reviewed above, "annual additions" are not a separate category of compensation, but are the sum of Lukoil's profit sharing plan distribution to an employee plus each employee's own elective deferral to his or her 401K plan. *See supra* page 6 & note 5. On this record, no reasonable jury could find that Benzinger received lesser compensation than her purportedly Russian comparator, Bogutska.

Benzinger's remaining theories of adverse action—relating to the promotion, professional development, and travel purportedly available to Russian employees—are also easily put to one side, because they do not find support in the record. Drawing all inferences in Benzinger's favor, Bogutska, Yuri, Anya, and Akinshina all potentially have at least some Russian ancestry.[12]

---

[12] Yulia, the intern, was also Russian, although Benzinger does not appear to claim that Yulia's intern experience is relevant to her theories of adverse action or an inference of discrimination.

Of these, only Bogutska worked in the same group as Benzinger and had similar responsibilities and qualifications. However, there is no evidence in the record, and Benzinger does not appear to argue, that Bogutska received superior perks and career advancement; such a lack of evidence is unsurprising given that Bogutska was essentially demoted via the hiring of Benzinger. Yuri and Anya worked in operations with entirely different roles and responsibilities from Benzinger. *See* Benzinger Tr. at 78–83. The operations department provides support to Lukoil's traders, and personnel in the department are involved in technical, complex matters involving Lukoil's supply chain, requiring specific training for their duties and responsibilities. Perazzo Decl. ¶¶ 18–20. Moreover, despite ample discovery, the record is silent as to the circumstances surrounding Yuri and Anya's alleged promotions, their qualifications, and the length of their tenures at Lukoil. *See generally* Benzinger Tr. at 76–86.[13] The record is similarly silent as to Akinshina. Even if it were not, Akinshina is the head of human resources at Litasco, whereas Benzinger was an executive assistant at Lukoil. The treatment of Yuri, Anya, and Akinshina thus cannot establish an adverse employment action, or an inference of discrimination, since they are not similarly situated to Benzinger in all material respects. *See, e.g.*, *Zuffante v. Elderplan, Inc.*, No. 02 Civ. 3250 (WHP), 2004 WL 744858, at *6 (S.D.N.Y. Mar. 31, 2004) (plaintiff and co-employees were not similarly situated where they held different positions and

---

[13] Benzinger's only concrete allegation as to "opportunities" or "perks" relates to Anya, who Benzinger testified was "invited to more trainings and was able to travel more than others in the operations department." Benzinger Tr. at 83–84. But, upon questioning, Benzinger conceded that she did not know when or how often Anya travelled or whether other members of the operations department were given the same opportunities. *Id.* at 84–85. Most importantly, Benzinger did not herself work in operations. No reasonable juror could find that Lukoil took adverse action against Benzinger on the basis that a purportedly Russian member of a *different* department travelled and attended trainings in accordance with the needs of that department.

did not share common job descriptions). There is, in short, no evidence that Benzinger suffered

disparate pay, disparate perks, or any other material adverse employment action.[14]

Benzinger, in a footnote, notes that a hostile work environment can itself constitute an

adverse employment action. *See* Pl. Mem. at 9 n.3. To prevail on a hostile work environment

claim under the NYSHRL, a plaintiff must show: "[1] that the harassment was sufficiently severe

or pervasive to alter the conditions of the victim's employment and create an abusive working

environment, and [2] that a specific basis exists for imputing the objectionable conduct to the

employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (internal quotation marks and

citations omitted). "The plaintiff must show that the workplace was so severely permeated with

discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment

were thereby altered." *Id.* Unlike pervasive harassment, "[i]solated, minor acts or occasional

episodes do not warrant relief." *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318

(2d Cir. 1999). This test has both objective and subjective elements. "Conduct that is not severe

or pervasive enough to create an objectively hostile or abusive work environment—an

environment that a reasonable person would find hostile or abusive—is beyond" the NYSHRL's

purview. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). "Likewise, if the victim does not

---

[14] Benzinger has not made a failure-to-promote claim, but, for avoidance of doubt, such a claim would be unsustainable on this record. A failure by an employer to promote an employee can constitute an adverse employment action. *Mills v. S. Conn. State Univ.*, 519 F. App'x 73, 75 (2d Cir. 2013). To establish a *prima facie* case for a failure to promote claim, a plaintiff must show that (1) she is a member of a protected class, (2) she applied for and was qualified for a job for which the employer was seeking applicants, (3) she was rejected for the position, and (4) the position remains open and the employer continues to seek applicants who have the plaintiff's qualifications. *Tanvir v. N.Y.C. Health & Hosps. Corp.*, 480 F. App'x 620, 621 (2d Cir. 2012). Benzinger has not shown that she applied to, or showed interest in, a position in the operations department, in Litasco's human resources, or as an intern. *See Slaitane v. Sbarro, Inc.*, No. 03 Civ. 5503 (AJP), 2004 WL 1202315, at *18 n.29 (S.D.N.Y. June 2, 2004) (collecting cases). Nor has she shown that any purported comparator was less qualified than she for any relevant position. *Gonzales v. City of New York*, 354 F. Supp. 2d 327, 334–35 (S.D.N.Y. 2005).

subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment," and there is no NYSHRL violation. *Id.* at 21–22.

Courts evaluate whether an environment is "hostile" or "abusive" by examining the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. To prevail, a plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were "sufficiently continuous and concerted in order to be deemed pervasive." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (citation omitted). Finally, "[a] plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class." *Brennan*, 192 F.3d at 318.

Benzinger has not identified any offensive comments or conduct that could support the claim that she was subject to any discriminatory harassment whatsoever, much less sufficiently pervasive or severe conduct or comments to establish a hostile or abusive work environment. This theory of adverse employment action—and employment discrimination—therefore fails too.

### ii.     No Inference of Discrimination

To state a *prima facie* claim of discrimination, the adverse action must also be made in circumstances giving rise to an inference of discrimination. The facts required to meet this element of the *prima facie* case will "inevitably vary in different employment discrimination cases." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001); *see Little v. Nat'l Broad Co.*, 210 F. Supp. 2d 330, 377 (S.D.N.Y. 2002). The circumstances giving rise to an inference of discrimination may include "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events

leading to the [adverse action]." *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015)

(quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)).

A plaintiff may raise an inference of discriminatory motivation "by showing that the

employer . . . treated him less favorably than a similarly situated employee outside his protected

group." *Graham*, 230 F.3d at 39. To do so, the plaintiff must allege that he was "similarly

situated in all material respects to the individuals with whom [he] seeks to compare

[himself]." *Id.* (internal quotation marks omitted). What this means, precisely, varies by

case. *See Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014). However, the Second

Circuit has identified as relevant factors: (1) whether the plaintiff and those she maintains were

similarly situated were subject to the same workplace standards; and (2) whether the conduct for

which the employer imposed discipline was of comparable seriousness. *See Graham*, 230 F.3d

at 40. "The plaintiff's and comparator's circumstances must bear a 'reasonably close

resemblance,' but need not be 'identical.'" *Daikin Am. Inc.*, 756 F.3d at 230.

Here, Benzinger relies on the same four theories of adverse action as circumstantial

evidence of discrimination in the form of "more favorable treatment of employees not in the

protected group." Pl. Mem. at 10 (quoting *Littlejohn*, 795 F.3d at 312). But, the only

purportedly Russian employee who, on this record, bears even a "reasonably close resemblance"

to Benzinger is Bogutska. For the reasons discussed above, a reasonable juror could not find that

Benzinger was treated less favorably than Bogutska or draw an inference of discrimination

therefrom. As to Yuri, Anya, and Akinshina, Benzinger's failure to set out their qualifications

(or any other relevant information) prevents a finding that her supposed comparators were

similarly situated in any, much less all, material respects, and thereby precludes even a "minimal

inference that the difference of treatment may be attributable to discrimination." *LeeHim v.*

*N.Y.C. Dep't of Educ.*, No. 17 Civ. 3838 (PAE), 2017 WL 5634128, at *6 (S.D.N.Y. Nov. 21, 2017) (citing *McGuinness*, 263 F.3d at 54).

Notably, it is undisputed that the vast majority of Lukoil's workforce is non-Russian; that none of the three managing directors who were in charge during Benzinger's tenure at Lukoil were of Russian descent—Reynolds and Rodilosso are American, and Fenner is British; that the sole member of the Lukoil board of directors during that time, Bullock, is British; and that Benzinger was replaced by Charles, an American. Def. 56.1 ¶¶ 59, 61–63. Benzinger does not claim, and the record does not suggest, that anyone made invidious comments or that statistical evidence supports her contentions. In the end, Benzinger is left only with her conclusory allegations that she was treated differently because she was not Russian. Under the totality of the circumstances, no reasonable juror could find that the record raises even a *de minimis* inference of discrimination. Benzinger's NYSHRL discrimination must fail on this ground, as well.[15]

---

[15] Accordingly, the Court need not reach the legitimate non-discriminatory reasons proffered by defendants for their alleged actions. Defendants note in this vein that Lukoil's review of Benzinger's salary, based on benchmarking data from Lukoil's outside expert, concluded that Benzinger's salary was above the upper bound for her role as Executive Assistant. Def. 56.1 ¶ 45; Fenner Decl. ¶ 12. Nor need the Court consider Benzinger's argument that the evidence to which she pointed to show adverse action and an inference of discrimination would also show pretext. *See* Pl. Mem. at 11. The Court notes, however, that Benzinger would need to present "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant[s] were false, and that more likely than not discrimination was the real reason for the employment action." *Forte v. Liquidnet Holdings, Inc.*, 675 F. App'x 21, 25–26 (2d Cir. 2017) (citation omitted). This burden is significantly higher than that of the *prima facie* case—which itself is a burden Benzinger has failed to clear. *A fortiori*, Benzinger's conclusory allegations could not suffice to demonstrate pretext or to survive summary judgment. *See Barkley v. Penn Yan Cent. Sch. Dist.*, 442 F. App'x 581, 585 (2d Cir. 2011); *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996).

## 2. NYCHRL Discrimination

Defendants also move for summary judgment on Benzinger's eighth cause of action, which alleges national origin discrimination in violation of the NYCHRL.

"[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing the NYCHRL's provisions broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (internal quotation marks and citations omitted). "Thus, even if the challenged conduct is not actionable under federal and state law, federal courts must consider separately whether it is actionable under the broader New York City standards." *Id.* Even under the NYCHRL, "petty slights or trivial inconveniences . . . are not actionable." *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 41 (1st Dep't 2009); *see also Mihalik*, 715 F.3d at 110 (to establish claim under NYCHRL, plaintiff need only demonstrate "that she has been treated less well than other employees" because of her protected characteristic).

To state a claim for discrimination, a plaintiff "need only show that her employer treated her less well, at least in part for a discriminatory reason." *Mihalik*, 715 F.3d at 110 n.8; *see Pryor v. Jaffe & Asher, LLP*, 992 F. Supp. 2d 252, 257 (S.D.N.Y. 2014) (a plaintiff "need only show differential treatment—that she is treated 'less well'—because of a discriminatory intent" (quoting *Mihalik*, 715 F.3d at 110)). Then, "the employer may present evidence of its legitimate, nondiscriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record establishes as a matter of law that discrimination played *no* role in its actions." *Mihalik*, 715 F.3d at 110 n.8 (emphasis in original) (internal quotation marks and alterations omitted); *see also Melman v. Montefiore Med. Ctr.*,

946 N.Y.S.2d 27 (1st Dep't 2012) (noting applicability of *McDonnell Douglas* framework in analyzing discrimination claims under NYCHRL).

In support of her NYCHRL discrimination claim, Benzinger cites the same four categories of allegedly preferential treatment afforded to purportedly Russian employees as with her NYSHRL claim. Benzinger argues that this evidence as to pay, perks, and promotions demonstrates that she was treated less well than her Russian counterparts because of a discriminatory intent. Pl. Mem. at 16.

Benzinger's NYCHRL claim fails for the same reasons her NYSHRL claim does not state a *prima facie* case. The evidence in the record simply would not allow a reasonable juror to conclude that Benzinger was treated less well than any similarly situated employee of Russian descent (or any other national origin). Benzinger's conclusory statements to the contrary do not suffice and cannot save her NYCHRL discrimination claim. Even under the NYCHRL, Benzinger "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome [defendants'] motion for summary judgment." *Hicks*, 593 F.3d at 166. Accordingly, the Court grants summary judgment to defendants on this claim as well.[16]

---

[16] Benzinger also attempts to establish her NYCHRL discrimination claim via a hostile work environment theory, again citing the same four categories of ostensibly preferential treatment, which are unsupported by the record. Pl. Mem. at 16. Benzinger argues that, under the more liberal standard of the NYCHRL, "even a single incident can suffice to carry Plaintiff's burden." *Id.* (citing *Mihalik*, 715 F.3d at 111). But, as reviewed above, the record does not contain evidence of even a single comment or any other incident that could allow a reasonable juror to find that Benzinger was treated less well than Russian employees because of a discriminatory intent. *See supra* pp. 23–24. Benzinger therefore cannot sustain her NYCHRL discrimination claim on a theory of hostile work environment, either.

**B.     Retaliation Claims**

**1.     NYSHRL Retaliation**

Defendants also move for summary judgment on Benzinger's ninth cause of action, which alleges retaliation in violation of the NYSHRL.

The NYSHRL makes it unlawful for an employer to retaliate or discriminate against an employee because she "has opposed any practices forbidden under this article or because . . . she has filed a complaint, testified or assisted in any proceeding under this article."  N.Y. Exec. Law § 296(7).

Like discrimination claims, retaliation claims under the NYSHRL are analyzed using the *McDonnell Douglas* burden-shifting framework.  *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).  As in the context of Benzinger's discrimination claim, she must first make out a *prima facie* case.  To establish a *prima facie* case of retaliation, a plaintiff must establish: (1) that she participated in an activity protected by the NYSHRL, (2) that her participation was known to her employer, (3) that her employer thereafter subjected her to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action.  *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010).  The burden of proof at the *prima facie* stage has been characterized as "*de minimis.*"  *Hicks*, 593 F.3d at 166.

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination."  *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000).  "An employee engages in a protected activity when she complains of an employment practice that she reasonably believes violates the law."  *Mayers v. Emigrant Bancorp, Inc.*, 796 F. Supp. 2d 434, 448 (S.D.N.Y. 2011).  "'[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that

the plaintiff's opposition was directed at conduct prohibited by" the NYSHRL. *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)).

"Mere complaints of unfair treatment . . . are not protected speech" in the employment retaliation context, and the "onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally." *Brantman v. Fortistar Capital, Inc.*, No. 15 Civ. 4774 (NSR), 2017 WL 3172864, at *7 (S.D.N.Y. July 22, 2017) (citation omitted); *see also, e.g.*, *Collazo v. County of Suffolk*, 163 F. Supp. 3d 27, 51 (E.D.N.Y. 2016) (plaintiff's general complaints "do[] not constitute a protected activity as [d]efendants could not have reasonably understood that [p]laintiff was opposing discriminatory conduct by lodging general complaints about her supervisor's unfair treatment").

The standard for an adverse action in the retaliation context, unlike the discrimination context, "is not limited to discriminatory actions that affect the terms and conditions of employment." *Vega*, 801 F.3d at 90 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006)); *see also Hicks*, 593 F.3d at 165 (describing anti-retaliation protection as "broader"). Instead, an adverse employment action for retaliation is "any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Vega*, 801 F.3d at 90 (quoting *White*, 548 U.S. at 57). Although "petty slights or minor annoyances" are not actionable, the Supreme Court has emphasized that "[c]ontext matters." *Hicks*, 593 F.3d at 165 (brackets omitted) (quoting *White*, 548 U.S. at 68–69). "[S]omething might be a 'petty slight' to one person but 'matter enormously' to another, such that it could 'deter a reasonable employee from complaining about discrimination.'" *Massaro v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 774 F. App'x 18, 22 (2d Cir. 2019) (quoting *Vega*, 801 F.3d at 90).

The final element—a causal connection between the protected activity and the adverse action—may be proved either "directly, through evidence of retaliatory animus directed against the plaintiff by the defendant," or "indirectly, by showing that the protected activity was followed closely by the discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct." *Hicks*, 593 F.3d at 170 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)). Direct evidence is "evidence tending to show, without resort to inference, the existence of a fact in question." *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1183 (2d Cir. 1992). A causal connection can also be proved indirectly by demonstrating temporal proximity between the protected activity and an adverse action. *See Zann Kwan*, 737 F.3d at 845. Although the Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," *Gorman-Bakos v. Cornell Co-op. Extension of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001), the Supreme Court has suggested that the temporal proximity "must be very close," *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) (internal quotation marks and citation omitted). *See also, e.g.*, *Flood v. UBS Asset Mgmt., Inc.*, No. 10 Civ. 374 (RJH), 2012 WL 288041, at *17 (S.D.N.Y. Feb. 1, 2012) ("[C]ourts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation." (citation omitted)); *Feliciano v. City of New York*, No. 14 Civ. 6751 (PAE), 2015 WL 4393163, at *10 (S.D.N.Y. July 15, 2015) (collecting cases requiring, for a retaliatory inference to arise, adverse activity to occur within approximately two months of plaintiff's protected activity).

If the *prima facie* burden is met, "a 'presumption of retaliation'" arises, which the employer "may rebut by 'articulating a legitimate, non-retaliatory reason for the adverse employment action.'" *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015) (brackets omitted) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).  If the employer provides such a reason, "the presumption of retaliation dissipates," and the burden shifts back to the plaintiff to prove "that the desire to retaliate was the but-for cause of the challenged employment action." *Id.* (citations omitted).  Although "but-for" causation does not require a showing that retaliation was an employer's sole motive, showing that retaliation was "simply a 'substantial' or 'motivating' factor in the employer's decision" is insufficient to prove a retaliation claim.[17]  *Zann Kwan*, 737 F.3d at 845 (citing *Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 348 (2013)).

Here, Benzinger has failed to demonstrate that she was engaged in protected activity known to her employer, that she was subjected to an adverse employment action, or that there was a causal connection between her protected activity and that action.

          *a.*        *No Protected Activity Known to Employer*

Benzinger did not engage in any protected activity related to national origin discrimination that was known to her employer.

---

[17] The Second Circuit has yet to decide explicitly whether the but-for causation standard applies to claims under the NYSHRL, as it does under Title VII.  *See Holcomb v. State Univ. of N.Y. at Fredonia*, 698 F. App'x 30, 31 (2d Cir. 2017); *Kleehammer v. Monroe County*, 583 F. App'x 18, 21 (2d Cir. 2014); *Zann Kwan*, 737 F.3d at 847 n.7.  The Circuit, however, has implicitly applied the but-for standard to NYSHRL claims on several occasions.  *See, e.g.*, *Saji v. Nassau Univ. Med. Ctr.*, 724 F. App'x 11, 14–16 (2d Cir. 2018) (affirming grant of summary judgment for defendant on Title VII and NYSHRL retaliation claims where plaintiff failed to raise genuine issue of material fact as to but-for causation).  The Court does not address the proper standard for NYSHRL claims here, since Benzinger cannot establish a *prima facie* case of retaliation.

Benzinger argues that the record reflects that she verbally complained of discrimination to Diehl and Fenner, and that Fenner admitted at his deposition that he was aware that Benzinger had complained of discrimination.  Pl. Mem. at 12–13.  With regard to the latter argument, as reviewed above, Benzinger misstates Fenner's testimony:  Fenner testified unambiguously that he was aware of Benzinger's complaints regarding FLSA misclassification and that she felt like she was not part of a team, but that Benzinger had never complained about discrimination.  Fenner Tr. at 35–37, 74–75.

As to the former, when asked at her deposition whether she had ever complained to Fenner and Diehl about her "concerns that Russian employees were being treated better than [she was]," Benzinger answered, "Yes."  Benzinger Tr. at 105.  When asked more specifically about the context of her complaint, Benzinger testified that she had discussed the issue of unfair treatment at her fall 2014 meeting with Fenner and Diehl.  *Id.* at 105–08.  She explained that she "had a conversation with Simon Fenner and Jennifer Diehl regarding [her] compensation and general treatment."  *Id.* at 106.  Benzinger testified that she told Fenner and Diehl that she "believe[d] it was unfair that [Bogutska] was compensated more [than Benzinger was]."  *Id.* at 107.  When asked about to be more specific about the complaints she made, for which she believed she was retaliated against, Benzinger answered, "[s]pecifically, the complaint for payment of overtime and that Inga was paid more than I was."  *Id.* at 196.  Notably, the email Benzinger sent Diehl and Fenner after the key meeting, which by its terms was a "summation of our recent meeting," did not mention discrimination, favoritism, or the treatment of employees of Russian descent relative to others.  Collyer Decl., Ex. H.

Under these circumstances, no Lukoil employee was actually aware or could have reasonably understood Benzinger's complaints about her own overtime and Bogutska's pay—

33

made in the context of a meeting that Benzinger had sought to ask for a raise and increased responsibilities—to be "directed at conduct prohibited" by the NYSHRL, *Galdieri-Ambrosini*, 136 F.3d at 292.  On this record, no reasonable juror could conclude that Fenner and Diehl should have understood Benzinger's complaints of unfair treatment (to wit, what Benzinger believed to be the higher pay of the other executive assistant) to relate to her German descent.

### b. *No Causally Connected Adverse Employment Action*

As with her discrimination claims, Benzinger relies upon the same four areas of preferential treatment ostensibly given to Russian employees—relating to compensation, promotion, and perks—as purported evidence of adverse employment action and causation.  *See* Pl. Mem. at 13–14 ("To the extent that Defendants are arguing that Plaintiff did not suffer any [retaliatory] adverse employment action, such argument should be rejected for substantially the same reasons delineated above." (citing Pl. Mem. at 7–10)).

For the same reasons as reviewed in connection with Benzinger's NYSHRL discrimination claim, there is no triable issue of fact as to whether the treatment of the "Russian" employees was an adverse employment action.  And, even if there was an adverse employment action, there is no causal connection between any alleged protected activity and the benefits supposedly afforded to employees of Russian heritage.  *See Butler v. Raytel Med. Corp.*, 150 F. App'x 44, 47 (2d Cir. 2005) (disregarding claim of discrimination that "was not supported by other record evidence or by specific examples in [plaintiff's] own testimony"); *Farias v. Instructional Sys.*, 259 F.3d 91, 99 (2d Cir. 2001) (declining to accept "conclusory statements unsupported by the record" as grounds to deny summary judgment).  Benzinger does not suggest that the alleged adverse action post-dated, much less was caused by, the vague complaints about discrimination she claims to have made in her September 2014 meeting with Fenner and Diehl. *See Holmes v. Astor Servs. for Children and Families*, No. 16 Civ. 2260 (CS), 2017 WL

3535296, at *7 (S.D.N.Y. Aug. 16, 2017) (no causal connection where allegedly retaliatory actions occurred before protected activity); *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.").

Although Benzinger's brief does not point to any other retaliatory adverse actions under the NYSHRL, for avoidance of doubt, the Court addresses potential additional retaliatory actions to which Benzinger alluded during her deposition. In particular, when asked to list all forms of retaliation she "claim[s] occurred," Benzinger replied that she: (i) "was paid less . . . [t]han Inga [Bogutska]"; (ii) was "delegated more work [than Inga]"; (iii) was "[n]ot . . . included on planning conversations"; and (iv) "was removed from projects." Benzinger Tr. at 196–97. None of these can support her claim.

First, as to Bogutska's pay, the Court has already addressed at length the infirmities of Benzinger's arguments. And the failure of her retaliation claim, to the extent based on Bogutska's pay, is compounded by the fact that the purported pay disparity preceded any alleged protected activity in which Benzinger engaged, and remained unchanged thereafter. *See Melman*, 946 N.Y.S.2d at 42 ("[A]n employer's continuation of a course of conduct [*i.e.*, defendant-hospital's paying plaintiff-employee too little and refusing to allow him to hire a uro-gynecologist] that had begun before the employee complained does not constitute retaliation because, in that situation, there is no causal connection between the employee's protected activity and the employer's challenged conduct."); *see also* Benzinger Tr. at 199 ("Q: . . . Is it your testimony that you were paid less than [Bogutska] because you complained? A: No.").

Second, Benzinger's "'allegation regarding additional work is far too conclusory to constitute an adverse employment action' because she alleges neither 'the nature of the additional work,' nor 'that the additional work was outside of her general responsibilities,' nor 'that there was a radical change in the nature of her work responsibilities.'" *Augustine v. Cornell Univ.*, No. 14 Civ. 7807 (JPO), 2018 WL 1474402, at *14 (S.D.N.Y. Mar. 26, 2018) (quoting *Kelly v. N.Y. State Office of Mental Health*, 200 F. Supp. 3d 378, 397 (E.D.N.Y. 2016)), *aff'd sub nom. Brown v. Cornell Univ.*, 758 F. App'x 226 (2d Cir. 2019). Although "a disproportionately heavy workload" can constitute a materially adverse action for retaliation purposes, *Feingold v. New York*, 366 F.3d 138, 153 (2d Cir. 2004), "a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities" to qualify as materially adverse. *Shultz v. Congregation Shearith Israel of City of N.Y.*, 867 F.3d 298, 304 (2d Cir. 2017) (citation omitted); *see also Young v. Rogers & Wells LLP*, No. 00 Civ. 8019 (GEL), 2002 WL 31496205, at *5 (S.D.N.Y. Nov. 6, 2002) ("Disproportionately heavy workload could perhaps be an adverse action, if the additional work significantly changed the employee's responsibilities so as to diminish that worker's role or status, or exposed the worker to dangerous or extreme conditions not appropriate to her job.").

Here, when asked what additional work she had been delegated after her complaint, Benzinger answered vaguely "[c]alendar management, travel, presentation help." Benzinger Tr. at 199. But Benzinger's offer letter from Lukoil, which she signed to accept employment, explained that "you will be responsible for effectively accomplishing the following duties," and listed eight sets of key duties. Collyer Decl., Ex. A. The first entry on the list was "[c]alendar management: [m]eetings, [t]ravel [a]rrangement, [a]ction [l]ist, etc." *Id.* The fifth was "[o]rganize current and create new Power Point presentations." *Id.* The NYSHRL requires that,

to qualify as adverse employment action, the additional work duties imposed must constitute more than just "an alteration of job responsibilities." *Shultz*, 867 F.3d at 304. The record here does not allow even a finding that Benzinger's job responsibilities had been altered. Similarly, when asked to explain the basis of her belief that, after her complaint, she had more work than Bogutska, Benzinger stated only, conclusorily, that "I had to work more." Benzinger Tr. at 200. But she conceded, at least in part, that she "had been receiving more work than [Bogutska] all along." *Id.* Benzinger's claims of having "more work" cannot establish adverse action.

Third, Benzinger testified that she was not included in what she believed were planning conversations. When asked what meetings and planning conversations she had been excluded from, Benzinger testified, "I don't know. I wasn't invited." *Id.* at 199. Benzinger's speculation that there were meetings to which she "would have been invited in the past," *id.*, is, without more, insufficient to avoid summary judgment for the defense. *Gupta*, 305 F. App'x at 689 (affirming dismissal of "allegation as mere speculation); *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995) ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." (internal quotation marks omitted)).

Fourth, as to her removal from projects, Benzinger specified that she was removed from human resources' "visa coordination." Benzinger Tr. at 197. Crucially, Benzinger herself did not believe this removal had anything to do with complaints of discrimination. Rather, she testified that the causal connection was that "I complained about their HR practices in relation to paying overtime and therefore I believe I was removed from HR projects." *Id.* By Benzinger's own admission, her removal from HR visa coordination, if in fact retaliatory, related to her complaint about overtime practices, not discrimination.

Thus, no reasonable juror could find that Lukoil subjected Benzinger to a materially adverse employment action or that there was a causal connection between any protected activity—of which there was none known to Lukoil—and such an action. The Court therefore grants summary judgment for defendants on Benzinger's NYSHRL retaliation claim.

### 2. NYCHRL Retaliation

Defendants also move for summary judgment as to Benzinger's tenth cause of action, for retaliation in violation of the NYCHRL.

The NYCHRL prohibits employers from "retaliat[ing] or discriminat[ing] in any manner against any person because such person has . . . opposed any practice forbidden under this chapter." N.Y.C. Admin. Code § 8-107(7). The NYCHRL imposes an identical standard to that of the NYSHRL, "except that the plaintiff need not prove any 'adverse' employment action; instead, [s]he must prove that something happened that would be reasonably likely to deter a person from engaging in protected activity." *Leon v. Columbia Univ. Med. Ctr.*, No. 11 Civ. 8559 (NSR), 2013 WL 6669415, at *12 (S.D.N.Y. Dec. 17, 2013), *aff'd*, 597 F. App'x 30 (2d Cir. 2015); *see Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 362 (S.D.N.Y. 2012).

NYCHRL claims must be reviewed considering the totality of the circumstances, *Mihalik*, 715 F.3d at 113, and the New York Court of Appeals has held that an employee can oppose his employer's discrimination without expressly mentioning discrimination as the source of his discontent. *See Albunio v. City of New York*, 16 N.Y.3d 472, 479 (2011) (plaintiff opposed employer's discrimination toward a prospective employee even though plaintiff did not specifically mention discrimination as a reason for disapproving of employer's conduct); *accord Mihalik*, 715 F.3d at 112.

Even under this more liberal standard, the record here could not support either an inference of retaliation or a finding that defendants did anything reasonably likely to deter a person from engaging in protected activity. *See, e.g.*, *Augustine*, 2018 WL 1474402, at *14–16 ("[W]ithout more detail, the Court cannot conclude that the unidentified 'additional work' would be reasonably likely to deter protected activity under the NYCHRL. . . . Nor does the record evidence permit the conclusion that such [a new] assignment would deter a reasonable employee from undertaking protected activity."); *Moore v. Verizon*, No. 13 Civ. 6467 (RJS), 2016 WL 825001, at *15 (S.D.N.Y. Feb. 5, 2016) (plaintiff failed to establish *prima facie* case "even under the less demanding NYCHRL standard" where she could not support an inference of retaliation and had not "made clear her disapproval of [the defendant's discrimination] by communicating to [him], in substance, that she thought [his] treatment of [the victim] was wrong" (quoting *Mihalik*, 715 F.3d at 115 n.12)); *Kellman v. Metro. Transp. Auth.*, 8. F. Supp. 3d 351, 390 (S.D.N.Y. 2014) ("Even after taking into account the NYCHRL's 'uniquely broad and remedial purposes,' no jury could find, based on the submitted evidence, that the issuance of the [letters of instruction critical of plaintiff], the investigation into the missing [activity report] and related Notice of Intent to Discipline, and the denial of training were caused even partly by retaliatory motives." (citation omitted)); *see also Mestecky v. N.Y.C. Dep't of Educ.*, 791 F. App'x 236, 239 (2d Cir. 2019) (affirming grant of summary judgment on NYCHRL claims where plaintiff failed to show that the "acts complained of [would] be reasonably likely to deter a person from engaging in protected activity" (citing *Ya-Chen Chen*, 805 F.3d at 77)); *accord Mihalik*, 715 F.3d at 112 (plaintiff making an NYCHRL retaliation claim "must show that she took an action opposing her employer's discrimination . . . and that, *as a result*, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action" (emphasis

added)).  Accordingly, for the same reasons Benzinger failed to raise a triable issue of fact as to her NYSHRL retaliation claim, summary judgment is warranted against Benzinger's NYCHRL retaliation claim as well.

### 3.    FLSA and NYLL Retaliation

Defendants also move for summary judgment as to Benzinger's fifth and sixth claims, for retaliation in violation of the FLSA and NYLL, respectively.

The FLSA provides that it is "unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA]."  29 U.S.C. § 215(a)(3).  The Court evaluates FLSA and NYLL retaliation claim under the same *McDonnell Douglas* burden-shifting framework.

First, a plaintiff must establish a *prima facie* case of retaliation by showing "(1) participation in protected activity known to the defendant, like the filing of an FLSA [or NYLL] lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action."  *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010); *see Santi v. Hot in Here, Inc.*, 18 Civ. 3028 (ER), 2019 WL 290145, at *3 (S.D.N.Y. Jan. 22, 2019) (NYLL and FLSA retaliation claims governed by same standard); *see also Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 302 (S.D.N.Y. 2011) ("To establish a prima facie case under [the NYLL], the plaintiff must adequately plead that while employed by the defendant, she made a complaint about the employer's violation of the law and, as a result, was terminated or otherwise penalized, discriminated against, or subjected to an adverse employment action." (internal quotation marks and citations omitted)). If the plaintiff does so, "the burden shifts to the defendant to articulate a 'legitimate, non-[retaliatory] reason for the employment action.'"  *Mullins*, 626 F.3d at 53 (quoting *Weinstock*,

224 F.3d at 42). The plaintiff must then produce "sufficient evidence to support a rational finding" that defendants' proffered rationales "were false, and that more likely than not discrimination was the real reason for the employment action." *Id.* at 53–54 (internal quotation marks omitted).

For a plaintiff to show she participated in a "protected activity known to the defendant," *id.* at 53, her "complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection," *Greathouse v. JHS Sec., Inc.*, 784 F.3d 105, 116 (2d Cir. 2015) (quoting *Kasten v. Saint–Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011)). An "employee need not invoke the Act by name," and "oral complaints made to an employer" will suffice, but the employee must "make[] the assertion of rights plain." *Id.*

An employment action disadvantages an employee if "it well might have 'dissuaded a reasonable worker from making or supporting [similar] charge[s].'" *Mullins*, 626 F.3d at 53 (quoting *White*, 548 U.S. at 68). A causal connection between an adverse action and a plaintiff's protected activity may be established "through evidence of retaliatory animus directed against a plaintiff by the defendant," *Johnson v. Palma,* 931 F.2d 203, 207 (2d Cir.1991) (internal quotation marks and citation omitted), or "by showing that the protected activity was closely followed in time by the adverse action," *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir.1988) (citation omitted).

Defendants argue that Benzinger was insufficiently clear in asserting her rights under the FLSA. Although defendants concede that Benzinger raised the issue of unpaid overtime as a result of FLSA misclassification, they argue that other communications of hers "muddy[] the waters significantly." Def. Mem. at 17. In particular, after a series of emails in which Fenner

committed to "work with [Diehl] to determine if [Benzinger] should be a non-exempt employee," Collyer Decl., Ex. I at 2, Benzinger eventually responded that "[t]he exempt vs. non[-exempt] concept is not an angle I wish to pursue due to the nature of the business and your concept of flexibility and quality of life work balance," *id.* at 1.

On this point, the Court holds with Benzinger—the evidence of a qualifying complaint is sufficient. A reasonable jury could find that, by expressing her overtime compensation complaints in terms like "exempt" and "misclassification" which inherently relate to her classification under the relevant labor statutes, Benzinger went beyond "abstract grumblings" or "amorphous expressions of discontent related to wages and hours"; a jury could find that Benzinger made a sufficiently clear and detailed articulation of FLSA- and NYLL-related grievances. *See Vasto v. Credico (USA) LLC*, 15 Civ. 9298 (PAE), 2017 WL 4877424, at *21 (S.D.N.Y. Oct. 27, 2017) (citations omitted). Despite her later change of heart, Benzinger's several explicit complaints regarding her status as an exempt employee were sufficiently clear to be found to constitute protected activity under the FLSA and NYLL. Benzinger's decision to cease her protected activity is irrelevant to whether she engaged in such activity known to Fenner and Diehl in the first place.

Defendants also argue that Benzinger has failed to adduce evidence sufficient to establish an employment action that disadvantaged her. Def. Mem. at 18–21. Benzinger testified that she was removed from human resources projects—specifically, from "visa coordination" duties— shortly after her complaint to Fenner and Diehl about her misclassification as exempt. Benzinger Tr. at 197.[18] Benzinger testified that "I complained about their HR practices in relation to paying overtime and therefore I believe I was removed from HR projects." *Id.* Defendants argue that

---

[18] Benzinger's other claimed adverse actions are insufficient for the reasons explained above.

Benzinger's removal from HR projects is not actionable "because [it] did not give rise to a materially adverse change in the terms and conditions of Plaintiff's employment." Def. Mem. at 20. But the cases cited by defendants in support of this proposition deal with *discrimination*, not *retaliation* claims. For FLSA and NYLL retaliation claims, a plaintiff need show only that the action taken by her employer "well might have 'dissuaded a reasonable worker from making or supporting [similar] charge[s].'" *Mullins v. City of New York*, 626 F.3d at 53 (internal quotation marks and citation omitted). Viewed in the light most favorable to her as the non-movant, Benzinger's removal from HR-related projects suffices to meet this lower standard. Because defendants have not offered a legitimate, non-retaliatory reason for removing Benzinger from her visa coordination duties, summary judgment must be denied as to these claims.

### C. Joint Employer Liability

Finally, defendants seek summary judgment on all claims against Litasco, on the grounds that Litasco was not Benzinger's employer. Benzinger argues that Litasco can be held liable under a theory of joint employer liability.

### 1. Legal Standard for Being an "Employer"

The FLSA defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The Supreme Court has emphasized that this is an expansive definition with "striking breadth." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992). In addition, "[a]n individual may simultaneously have multiple 'employers' for the purposes of the FLSA, in which case, 'all joint employers are responsible, both individually and jointly, for compliance with all the applicable provisions of

the [FLSA].'" *Olvera v. Bareburger Grp. LLC*, 73 F. Supp. 3d 201, 204–05 (S.D.N.Y. 2014) (citing 29 C.F.R. § 791.2(a)).[19]

"When it comes to 'employer' status under the FLSA, control is key." *Lopez v. Acme Am. Envtl. Co., Inc.*, No. 12 Civ. 511 (WHP), 2012 WL 6062501, at \*3 (S.D.N.Y. Dec. 6, 2012); *see also Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 135 (2d Cir. 1999) ("[C]ontrol of employees is central to deciding whether appellant should be deemed an employer."). The Second Circuit has held that "the determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in 'economic reality rather than technical concepts,' determined by reference not to 'isolated factors, but rather upon the circumstances of the whole activity.'" *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008) (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961); *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)).

Courts have identified several sets of factors relevant to the economic reality inquiry. In its narrowest form, this analysis evaluates whether an alleged employer exercised formal control, and at its broadest it evaluates functional control. Accordingly, "the exercise of formal control over employees is sufficient, but not necessary, to adequately allege an employer relationship." *Xiaoyan Liu v. Canteen 82 Inc.*, No. 17 Civ. 7862 (KPF), 2018 WL 6067228, at \*5

---

[19] The statutory standard for employer status under the NYLL is nearly identical to the FLSA's. *Compare* 29 U.S.C.A. § 203(d) ("'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ."), *with* N.Y. Lab. Law § 190(3) ("'Employer' includes any person, corporation, limited liability company, or association employing any individual in any occupation, industry, trade, business or service."). Courts in this District have regularly applied the same tests to determine, under the FLSA and the NYLL, whether entities were joint employers. *See Ocampo v. 455 Hosp. LLC*, No. 14 Civ. 9614 (KMK), 2016 WL 4926204, at \*5 n.7 (S.D.N.Y. Sept. 15, 2016); *Paz v. Piedra*, No. 09 Civ. 3977 (LAK) (GWG), 2012 WL 121103, at \*5 (S.D.N.Y. Jan. 12, 2012); *Spicer v. Pier Sixty LLC*, 269 F.R.D. 321, 335 n.13 (S.D.N.Y. 2010); *Ansoumana v. Gristede's Operating Corp.*, 255 F. Supp. 2d 184, 189 (S.D.N.Y. 2003).

(S.D.N.Y. Nov. 20, 2018) (quoting *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12

(2d Cir. 1984)).

### a.    Formal Control

When evaluating formal control, courts consider "whether the alleged employer (1) had

the power to hire and fire the employees, (2) supervised and controlled employee work schedules

or conditions of employment, (3) determined the rate and method of payment, and (4) maintained

employment records." *Carter*, 735 F.2d at 12 (quoting *Bonnette v. Calif. Health & Welfare

Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983)).   "Formal control does not require continuous

monitoring of employees, looking over their shoulders at all times, or any sort of absolute control

of one's employees." *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 939

(S.D.N.Y. 2013) (internal quotation marks omitted) (quoting *Herman*, 172 F.3d at 139).

### b.    Functional Control

The Second Circuit has identified a number of factors pertinent to determining whether a

person or entity, even if lacking formal control, exercised "functional control" over an employee.

In *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61 (2d Cir. 2003), involving an employer and its

subcontractors, the court identified the following as pertinent, although not exclusive, factors:

> (1) whether [alleged employers'] premises and equipment were used for the
> plaintiffs' work; (2) whether the [subcontractors] had a business that could or did
> shift as a unit from one putative joint employer to another; (3) the extent to which
> plaintiffs performed a discrete line-job that was integral to [alleged employers']
> process of production; (4) whether responsibility under the contracts could pass
> from one subcontractor to another without material changes; (5) the degree to which
> the [alleged employers'] or their agents supervised plaintiffs' work; and (6) whether
> plaintiffs worked exclusively or predominantly for the [alleged employers].

*Id.* at 71–72.

### c.    Single-Integrated-Enterprise Liability

Finally, in the context of affiliated entities within a corporate family, courts in this District have increasingly applied another test: the single-integrated-enterprise test. *See, e.g.*, *Morales v. Anyelisa Rest. Corp.*, No. 18 Civ. 7641 (JGK), 2019 WL 3430106, at *2 (S.D.N.Y. July 30, 2019); *In re Domino's Pizza Inc.*, No. 16 Civ. 6274 (AJN), 2018 WL 1587593, at *2 (S.D.N.Y. Mar. 27, 2018).[20]  The single employer rule was developed by the National Labor Relations Board in the collective bargaining context, and has since been adopted by courts and extended to various employment law contexts. *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996); *see, e.g.*, *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 224 (2d Cir. 2014) (Title VII and NYSHRL contexts); *Shukla v. Viacom Inc.*, 18 Civ. 3522 (PAE), 2019 WL 1932568, at *6 (S.D.N.Y. May 1, 2019) (NYCHRL context); *Yeh*, 2019 WL 633355, at *6 (FLSA).

The single employer doctrine holds multiple legally distinct entities—*e.g.*, "parent and wholly-owned subsidiary corporations, or separate corporations under common ownership and management"—liable as a single employer when the entities are a single integrated enterprise. *Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2005).  Whether a group of entities qualifies as a single integrated enterprise turns on four factors: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common

---

[20] In *Hart*, this Court declined to apply this test in the FLSA context, noting that the Second Circuit had yet to address the applicability of the test to FLSA cases, that only one court in this District appeared to have applied the doctrine to FLSA cases, and that the test would not alter the FLSA inquiry at hand.  967 F. Supp. 2d at 940 n.16.  Courts in this District—including this Court, *see Yeh v. Han Dynasty, Inc.*, 18 Civ. 6018 (PAE), 2019 WL 633355, at *6–7 & n.6 (S.D.N.Y. Feb. 14, 2019)—have since held the test applicable to the FLSA. *See, e.g., Juarez v. 449 Restaurant, Inc.*, 29 F. Supp. 3d 363, 368 & n.3 (S.D.N.Y. 2014); *Flores v. 201 W. 103 Corp.*, 256 F. Supp. 3d 433, 440–41 (S.D.N.Y. 2017); *Li v. Ichiro Sushi, Inc.*, No. 14 Civ. 10242 (AJN), 2016 WL 1271068, at *6 (S.D.N.Y. Mar. 29, 2016); *Cordova v. SCCF, Inc.*, No. 13 Civ. 5665 (LTS), 2014 WL 3512838, at *3 (S.D.N.Y. July 16, 2014); *Lopez v. Pio Pio NYC, Inc.*, No. 13 Civ. 4490 (HB), 2014 WL 1979930, at *3–4 (S.D.N.Y. May 14, 2014); *Chen v. TYT E. Corp.*, No. 10 Civ. 5288 (PAC), 2012 WL 5871617, at *3 (S.D.N.Y. Mar. 21, 2012).

ownership or financial control." *Brown*, 756 F.3d at 226 (citation omitted). Although no one factor is dispositive, "control of labor relations is the central concern." *Id.* (citation omitted).

The doctrine "applies in 'extraordinary circumstances' where plaintiff demonstrates 'sufficient indicia of an interrelationship between the immediate corporate employer and the affiliated corporation to justify the belief on the part of an aggrieved employee that the affiliated corporation is jointly responsible for the acts of the immediate employer.'" *Morangelli v. Chemed Corp.*, 922 F. Supp. 2d 278, 285 (E.D.N.Y. 2013) (quoting *Herman v. Blockbuster Entm't Grp.*, 18 F. Supp. 2d 304, 308 (S.D.N.Y. 1998)), *reconsideration denied in part*, 2013 WL 1212790 (E.D.N.Y. Mar. 25, 2013); *see Fenner v. News Corp.*, No. 09 Civ. 9832 (LGS), 2013 WL 6244156, at *9 (S.D.N.Y. Dec. 2, 2013) ("There is a strong presumption that a parent is not the employer of its subsidiary's employees. '[T]he law only treats the employees of a corporate entity as the employees of a related entity under extraordinary circumstances.'" (quoting *Murray*, 74 F.3d at 404)).

### 2. Analysis

Benzinger here argues only that Lukoil and Litasco acted as a single integrated enterprise with regard to her employment. *See* Pl. Mem. at 4–6 (addressing only single employer doctrine); Def. Reply at 2 ("The parties generally agree on the standard applicable to assessing joint employer liability between a corporate parent and subsidiary. . . the single employer doctrine. . . ."). Accordingly, the Court applies only that test, whose outcome here applies equally to all of Benzinger's claims against Litasco. *See Juarez*, 29 F. Supp. 3d at 367–68 & n.3 (applying only single-integrated-enterprise doctrine where plaintiff "urge[d]" the court to treat that as the relevant test and defendants did not argue otherwise).

Here, the record could not support a finding that Lukoil and Litasco were a single integrated enterprise. Litasco and Lukoil are separate corporate entities: Litasco is the parent

47

company for Lukoil and other subsidiaries worldwide. Def. 56.1 ¶¶ 65–66, 69. The companies operate in separate countries, out of separate offices, with separate staff performing company-specific roles. Fenner Decl. ¶ 6. Lukoil is managed by Fenner, who reports to the sole member of Lukoil's board of directors, Bullock. Def. 56.1 ¶ 70. Throughout her employment, Benzinger reported directly to Lukoil's managing directors. *Id.* ¶¶ 15–17.

Lukoil and Litasco each maintain separate human resources departments to handle employee issues that arise in each respective company. Fenner Decl. ¶ 8. Lukoil's human resources department is run out of the New York office by Perazzo, and, before Perazzo's employment, Lukoil utilized the services of an outside human resources coordinator, Diehl, who did not provide those services to Litasco. *Id.* In contrast, Litasco's human resources department is run by Akinshina, who is in Geneva. *Id.* At all relevant times, Lukoil, not Litasco, paid Lukoil's employees' wages. Def. 56.1 ¶ 79.

Benzinger makes three main arguments why Lukoil and Litasco ostensibly acted as a single integrated enterprise. First, Benzinger notes that Lukoil's profits are sent to Litasco, Pl. Mem. at 6, and that Fenner testified that teams at Lukoil have "very tight relationships with" teams at Litasco and Litasco's other subsidiaries. Fenner Tr. at 16. Second, Benzinger notes her testimony that she considered Litasco's Akinshina to be her supervisor on certain projects, including: "performance management training," which entailed "organizing the paperwork of the performance reviews" for which the managing directors were responsible; "[g]oal settings," which "was about how to set goals for your role according to the Litasco model"; and "[o]rganizing visas." Benzinger Tr. at 14, 19–21. Third, Benzinger refers to the Litasco "Competency Model," which the Lukoil managing directors sent, along with a Lukoil "Performance Management Policy," to all Lukoil employees on January 1, 2014.

48

As a matter of law, these innocuous facts cannot support a finding of "extraordinary circumstances" so as to justify application of the single employer doctrine. A wholly-owned subsidiary's distribution of profits to its parent corporation does not indicate uncommonly close corporate control. *See Velez v. Novartis Pharms. Corp.*, 244 F.R.D. 243, 254 (S.D.N.Y. 2007) (citations omitted). And employees of each business "can maintain some amount of communication with senior employees" of the other "without collapsing corporate formalities." *Fenner*, 2013 WL 6244156, at *9; *see id.* at *11 ("The presumption is that 'corporate personalities remain distinct' and 'that directors and officers holding positions with a parent and its subsidiary can and do "change hats" to represent the two corporations separately, despite their common ownership.'" (quoting *United States v. Bestfoods*, 524 U.S. 51, 69 (1998)); *Balut v. Loral Elec. Sys.*, 988 F. Supp. 339, 347 (S.D.N.Y. 1997) (even though senior employees "ultimately report to the parent's officers . . . this exercise of control does not [necessarily] exceed the control normally exercised by a parent" (citation omitted)), *aff'd*, 166 F.3d 1199 (2d Cir. 1998). Finally, "the fact that [a subsidiary] adopted policies promulgated by [its parent] is insufficient to show that [the parent] exercised centralized control over the [subsidiary's] employees." *Fenner*, 2013 WL 6244156, at *10; *accord Meng v. Ipanema Shoe Corp.*, 73 F. Supp. 2d 392, 405 (S.D.N.Y. 1999) ("[A] common benefits package speaks only to economies of scale and not to centralized control of labor relations." (internal quotation marks omitted)).

The record is thus insufficient to raise a question of fact as to whether Litasco was Benzinger's employer for purposes of any of the claims in this case. This requires entry of summary judgment in favor of Litasco on all claims against it.

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion for summary judgment on all of Benzinger's NYSHRL and NYCHRL claims and dismisses Litasco as a party. The Court, however, otherwise denies defendants' motion for summary judgment.

This case is now ready to proceed to trial on the remaining claims, all of which are under the FLSA and NYLL. The Court directs the parties to confer, and, by March 30, 2020, to file a joint letter apprising the Court of the anticipated length of the trial. Barring notice that the case is on track for a prompt settlement, the Court expects then to set a schedule requiring submissions of a Joint Pretrial Order and the other required pretrial filings set forth in the Court's Individual Rules.

The Court respectfully directs the Clerk of Court to terminate the motion pending at docket 69.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: March 20, 2020
     New York, New York